**UNITED STATES of America, Appellee,**

v.

**John F. TRULLO,**
**Appellant.**

**No. 86–1728.**

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1986.

Decided Jan. 13, 1987.

---

We hold that appellant's actions and the location at which they took place, when viewed through the prism of an experienced police officer, gave rise to a particularized and reasonable suspicion of criminal activity. We also hold that the officer's drawing of his gun was reasonable under the circumstances and did not transform the legitimate stop into an arrest. We further hold that the officer was warranted in the belief that his safety was in danger and therefore his pat down of appellant clearly was justified.

While we acknowledge that this is a close case, for the reasons which follow we affirm.

Owen S. Walker, Federal Defender Office, for appellant.

Sydney Hanlon, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., was on brief for appellee.

Before COFFIN, Circuit Judge, TIMBERS,* Senior Circuit Judge, and BOWNES, Circuit Judge.

TIMBERS, Circuit Judge:

John F. Trullo ("appellant") appeals from a judgment of conviction entered July 18, 1986 in the District of Massachusetts, Walter J. Skinner, *District Judge*, on a conditional plea of guilty to a one count indictment charging appellant with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982). Appellant, having pleaded guilty, reserved his right to appeal the issues relating to his May 2, 1985 stop and arrest.

On appeal, appellant argues, first, that the officers did not have the requisite articulable suspicion, required by *Terry v. Ohio*, 392 U.S. 1 (1968), to justify the stop of appellant; second, that the officer's use of a drawn gun at the time of the stop turned that stop into an arrest for which probable cause was lacking; and, third, that the officer's decision to frisk appellant was unreasonable.

I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.

On May 2, 1985 at 1:00 PM two Boston police detectives and a DEA agent in an unmarked car were patrolling that portion of Boston known as the "Combat Zone" for drug activity. The Combat Zone is a high crime area known for prostitution and drug dealing. As the officers were stopped at a light, they noticed a gray Thunderbird automobile stopped on the curb of Washington Street with a man (whom we now know as appellant) at the wheel. Washington Street is the main street of this portion of the Combat Zone. As the officers watched, a second man approached the Thunderbird from the sidewalk and engaged appellant in a twenty second conversation through the open passenger-side window. The second man got into the car and had an additional five or ten second conversation with appellant. The car then pulled out and proceeded for two blocks until it made a right turn onto Hayward Place, a short street which connects Washington Street and Harrison Avenue. The officers followed the Thunderbird in their unmarked car.

While Hayward Place is trafficked during early morning and late afternoon rush

---

* Of the Second Circuit, sitting by designation.

hours, it was deserted at the time appellant entered it. The officers parked three car lengths behind appellant's car and had an unobstructed view of it. The officers observed appellant and the second man engaged in a thirty second discussion with their heads inclined toward each other. The second man then got out of the car and walked back toward Washington Street. One of the officers followed him on foot.

Appellant, with the other two officers following, drove his car out of Hayward Place onto Harrison Avenue where he stopped for a red light. The two officers, who were not in uniform, got out of their car and approached appellant's car on foot. The officer on the driver's side of appellant's car approached with his badge in his left hand and his drawn gun in his right hand. That officer identified himself as a police officer and asked appellant to get out of the car. As appellant opened the door and got out, the officer noticed a "bulge" in appellant's right-hand pants pocket. The officer asked appellant what it was and patted it with his hand. The officer testified that it felt hard and narrow like a knife. The officer reached into the pocket and found a knife with a spring-activated blade retracted in the handle. The officer then arrested appellant for carrying an illegal weapon in violation of state law. A subsequent search of appellant's person at the station house during booking disclosed two half-gram packets of cocaine in appellant's hat. An inventory search of appellant's car disclosed a fake oil can containing 22 half-gram packets of cocaine.

On May 17, 1985 appellant was indicted on one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). On June 10, 1985 appellant moved to suppress the cocaine seized from his person and car as products of an illegal search. Appellant claimed that the officers did not have either "articulable suspicion" to justify stopping appellant or probable cause to arrest him. He also claimed that the inventory search of the car was illegal even if the stop and arrest were legal.

In an opinion dated August 5, 1985 the district court granted the motion to suppress in part. The court held that the circumstances leading to the officers' stop of appellant provided sufficient articulable suspicion to permit a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). The court held that the officer's seizure of the knife also was justified under *Terry*. The court, therefore, refused to suppress the cocaine found on appellant's person as fruit of a lawful stop and arrest. The court, however, held that the inventory search was in bad faith and impermissible. It suppressed the cocaine found in the trunk. The government appealed that portion of the order suppressing the cocaine found in the trunk. We reversed the district court and held the inventory search to be permissible. 790 F.2d 205 (1st Cir.1986). We did not address the court's *Terry* ruling.

On June 16, 1986 appellant entered a conditional plea of guilty, reserving his right to appeal the permissibility of his stop and arrest. *See* Fed.R.Crim.P. 11(a)(2). On July 18, 1986 the court sentenced appellant to two years in prison. He currently is serving the sentence.

For the reasons stated below, we affirm the judgment of conviction and of course the propriety of the May 2, 1985 stop and arrest.

## II.

In *Terry v. Ohio, supra,* 392 U.S. at 25–27, the Supreme Court recognized that, although the Fourth Amendment regulates police-citizen encounters which fall short of full scale arrests, it does not prohibit encounters based on less than probable cause for arrest. While it is beyond cavil that not all police-citizen encounters implicate Fourth Amendment concerns, there is a grey area into which some encounters fall. The Court in *Terry* held that more intrusive encounters, short of a full scale arrests, must be justified by reasonable suspicion proportional to the degree of the intrusion. *Id.* at 19. That suspicion cannot

be inchoate, but must be based on "specific and articulable facts ... together with rational inferences from those facts...." *Id.* at 21.

The Supreme Court has enunciated a dual inquiry for evaluating the reasonableness of a *"Terry* stop". A court reviewing police action must inquire:

> "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

*United States v. Sharpe,* 470 U.S. 675 (1985) (quoting *Terry, supra,* 392 U.S. at 23. *See also United States v. Streifel,* 781 F.2d 953 (1st Cir.1986) (applying *Sharpe* standard). In the instant case, having made this inquiry, we answer it in the affirmative and hold that the investigative stop of appellant was reasonable and comported with *Terry* requirements. In so holding, we believe it is appropriate to state that the facts presented by this case, in our view, represent the outermost reaches of a permissible *Terry* stop; and it should be borne in mind that "... in law as in life, today's satisfactory explanation may very well be tomorrow's lame excuse." *United States v. Vazquez,* 605 F.2d 1269, 1280 (2d Cir.1979).

### A.

We wish to make clear at the outset that a determination of whether the stop was justified at its inception depends on the totality of the circumstances confronting the officer. "[T]he assessment must be based upon all of the circumstances." *United States v. Cortez,* 449 U.S. 411, 418 (1981). As the Second Circuit put it, "We view as wise the admonition of the District of Columbia Circuit that 'the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole.' " *United States v. Magda,* 547 F.2d 756, 758 (2d Cir.1976), *cert. denied,* 434 U.S. 878 (1977) (quoting

*United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976)).

The initial factor which the officers considered was the nature of the Combat Zone, the area in which appellant's conduct took place. "Officers may consider the characteristics of the area in which they encounter a vehicle." *United States v. Brignoni-Ponce,* 422 U.S. 873, 884 (1975). *See Cortez, supra,* 449 U.S. at 411. ("Of critical importance, the officers knew that the area was crossing point for illegal aliens.") *See also United States v. Corral-Villavicencio,* 753 F.2d 785, 789 (9th Cir.1985) (totality of circumstances includes fact that area known as one in which contraband pick-ups are made); *United States v. Rickus,* 737 F.2d 360, 365 (3d Cir.1984) ("The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely."); *United States v. Gomez,* 633 F.2d 999, 1005 (2d Cir.1980) ("The car was halted in an area of high narcotics activity—a factor appropriate in considering whether an investigatory stop was proper."), *cert. denied,* 450 U.S. 994 (1981); *United States v. Constantine,* 567 F.2d 266, 267 (4th Cir.1977) ("An area's disposition toward criminal activity is an articulable fact."), *cert. denied,* 435 U.S. 926 (1978). Here, appellant's activities took place in what is unquestionably a high crime area of Boston. The officers testified that narcotics transactions frequently take place there. The district court described the area as "a high crime area. It contains 'adult' movie theatres and bookstores and is a center of prostitution and the exchange of various forms of contraband. It has also been the scene of many stabbings and shootings, often fatal." Location alone, however, is insufficient to justify a *Terry* stop. *Brown v. Texas,* 443 U.S. 47, 52 (1979). In *Brown* the police could articulate no fact other than location, while in the instant case the police pointed to appellant's conduct which they considered suspicious. It would fly in the face of well-settled precedent were we to

hold, as appellant invites us to do, that the location was of minimal consequence and should not serve as one appropriate factor in determining the reasonableness of a *Terry* stop. We decline the invitation.

A second articulable factor upon which we hold the officers justifiably could have relied was appellant's conduct. The initial conversation between appellant and the individual who approached his vehicle lasted only a few seconds, after which the second man entered appellant's vehicle. The two drove a very short distance, approximately a block and a half, and turned onto a deserted side street. After parking on that side street the two, with their heads inclined toward each other, engaged in a conversation of short duration. The second man then exited the vehicle and walked back in the direction from which the two had driven. The officers testified that such behavior was indicative of some sort of illegal transaction. In the officers' judgment a clandestine transaction had taken place, a judgment to which we give appropriate deference.

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

*Cortez, supra*, 449 U.S. at 418.

The circumstances under which the officers acted "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Hall, supra*, 525 F.2d at 859. *See also United States v. McHugh*, 769 F.2d 860, 865 (1st Cir.1985) ("[i]n assessing the import of the evidence, the expertise and experience of the law enforcement officers must also be taken into account."). The three officers who observed appellant's actions had collectively some twenty-eight years of experience in law enforcement. The officers also had special expertise in the area of narcotics. Based on this experience and expertise, the officers unanimously determined that they were observing an illegal transaction.

We hold that the actions of the officers, based on the totality of the circumstances, were justified at their inception.

We are not persuaded by appellant's argument that his actions also could be interpreted as manifestations of wholly innocent conduct. The conversation between appellant and the second man which occurred on Hayward Place lasted only approximately thirty seconds. Thus, it seems unlikely that the two went there to talk or, as appellant suggests, to browse through "an 'art' magazine one of them could have just purchased in a Combat Zone bookstore." Also, since the second man got out of the car and walked back towards the place from which appellant had picked him up, it is unlikely that the second man was seeking transportation from appellant. We could, no doubt, hypothesize some innocent explanation of appellant's conduct, for "[i]t must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Viegas*, 639 F.2d 42, 45 (1st Cir.), *cert. denied*, 451 U.S. 970 (1981) (quoting *United States v. Price*, 599 F.2d 494, 502 (2d Cir.1979)). *Accord, United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983); *United States v. Black*, 675 F.2d 129, 137 (7th Cir.1982), *cert. denied*, 460 U.S. 1068 (1983). It is precisely for that reason that the applicable standard in determining the propriety of a *Terry* stop is whether a defendant's acts give rise to an articulable, reasonable suspicion of criminal activity and not whether they can be construed as innocent through speculation.

### B.

We turn next to the second part of our inquiry: whether the officers' actions at the time of the *Terry* stop reasonably were related in scope to the circumstances which provided the justification for the interference in the first place.

■ Appellant argues that the use of a drawn gun by one of the officers at the time of the initial stop was unreasonable and went beyond the limits permitted by *Terry*. He contends that such conduct converted the stop into an arrest requiring probable cause. We disagree and hold that the officer's drawing of his gun was reasonably related in scope to the circumstances which justified stopping appellant in the first place.

It cannot be said that a display of a gun by a police officer automatically converts a stop into an arrest. In so holding here, we follow the approach fashioned by the Second Circuit in *United States v. Harley*, 682 F.2d 398 (2d Cir.1982). In *Harley*, the court looked to the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, and the reaction of the suspect as the police approached him to determine whether the officers' display of weapons was justified. *Id.* at 402. In the instant case, the officer suspected appellant of dealing in narcotics, a pattern of criminal conduct rife with deadly weapons. The officer's reasonable suspicions justified the stop. He testified that he had seen many drug transactions take place and the conduct of appellant was consistent with such a transaction. Appellant was stopped in a high crime area. From his experience, the officer knew the area harbored a large number of individuals who carried deadly weapons. While the time of day and the reaction of appellant arguably might be said not to weigh in justification of displaying a gun, the other factors clearly support the officer's decision.

Further, the officer who approached appellant's vehicle with his gun drawn testified that he did so out of concern for his own safety. As the district court succinct-ly stated, "To draw a gun while approaching a suspect in this context is an act of caution.... Given the history of the Combat Zone, this was elementary prudence." We agree.

### C.

■ Appellant's final argument is that the officer did not have a sufficient basis to frisk appellant after he stopped him. We hold that this argument is without merit.

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.... The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*Terry, supra,* 392 U.S. at 24–27.

Application of these principles leaves us with no doubt that the officer acted reasonably in frisking appellant and seizing the knife secreted in his pocket.

First, the officers suspected that appellant had just engaged in an illegal transaction, quite probably a narcotics sale. They testified that concealed weapons were part and parcel for the drug trade and that the Combat Zone was notorious for stabbings and shootings. As the Second Circuit has held, "[W]e have recognized that to substantial dealers in narcotics, firearms are as much 'tools of the trade' as are most commonly recognized articles of drug paraphernalia." *United States v. Oates,* 560 F.2d 45, 62 (2d Cir.1977).

Second, once the officer noticed the bulge in appellant's pocket these generalized suspicions became particularized, permitting the minimal intrusion of a limited

search of appellant's outer clothing. Once the "pat down" confirmed that the article in appellant's pocket had the characteristics of a weapon, the officer was justified in reaching into the pocket and seizing it. The officer had reasonable grounds to believe that appellant was armed and dangerous. It was therefore imperative, for the safety of the officers and the general public, that the officer take the action that he did. We hold that such conduct clearly was reasonable under the Fourth Amendment.

### III.

To summarize:

We affirm the judgment of conviction of appellant for possession of cocaine with intent to distribute. We hold that the officers' action in stopping appellant was justified at its inception and that the nature of the stop was reasonably related in scope to the circumstances surrounding it. We also hold that the limited intrusion in the form of a frisk, which resulted in the seizure of an illegal weapon, was a reasonable search under the Fourth Amendment.

Affirmed.

BOWNES, Circuit Judge (dissenting).

I dissent because I believe that this case goes beyond the outer limits of a permissible investigative stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The inquiry into the appropriateness of an investigative stop under *Terry* and its progeny involves a consideration of two factors: (1) "whether the officer's action was justified at its inception"; and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry* 392 U.S. at 20, 88 S.Ct. at 1879. The *Terry* stop must be conducted in a manner proportionate to the degree in which an officer's reasonable suspicions have been aroused: "The greater the intrusion, the stronger the basis for the officers' action must be." *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). I have grave reservations about the adequacy of the basis on which the stop here was initially made. In addition, even assuming that some stop was justified under the circumstances, I believe the court's opinion misconstrues the relationship between the two prongs of the test. The court does not limit the extent of the stop to the degree of the suspicion aroused. Rather, the court ratifies the police officer's drawing of his gun by overstating both the strength of those suspicions and the basis for assuming that the officers were in danger. I do not believe these findings are supported by the record.

The Supreme Court, interpreting *Terry,* has stressed that " '[the] demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*' " *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (quoting *Terry v. Ohio,* 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18 (1968)). The facts in *Terry* provide an example of reasonable suspicions based on specific observations and a graduated police response.[1] General circumstances may be considered as factors in combination with specific facts but they do not suffice when they stand alone.

---

**1.** It is perhaps worth restating that *Terry* was a case where a police officer observed

two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner;

where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. *Terry,* 392 U.S. at 23, 88 S.Ct. at 1181. The officer followed the two men and approached the group of three. He identified himself as a police officer and asked for their names. It was only when he received a mumble for a response that he finally grabbed Terry and frisked him. *Terry* at 7, 88 S.Ct. at 1872.

The Court has accordingly held that suspicions based solely on very general characteristics of a "drug courier profile" do not meet the specificity requirement. *Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980). Similarly, the mere presence of an individual in a location known as a high crime area is not a "specific, objective" fact under *Terry*. *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Finally, society's legitimate interest in encouraging trained police officers to use their judgment does not permit them to conduct searches and seizures at their "unfettered discretion." *Id.*

The Court has upheld *Terry* stops where these general factors were combined with specific circumstances. Thus, in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), cited by the court here, the Supreme Court viewed the characteristics of the location of the stop to be of "critical importance." This general circumstance was combined in that case, involving the smuggling of aliens, with a police analysis of remarkable specificity, predicting the day, time, place, nature of the vehicle sought and other circumstances.[2]

While I would not require that level of specificity in all cases, the specific facts here are sparse. A man let another man into his car after a brief conversation and drove about two and a half blocks, stopping on a deserted street. After they "appeared" to have another brief conversation, with heads inclined, the passenger exited the car and walked back where he came from. During the last conversation, the two men were in full view of the unmarked car containing the police officers and made no attempt to conceal what they were doing. The officers did not see any objects being exchanged.

The district judge apparently felt uneasy about simply deferring to the officers' judgment on these facts alone. After weighing the pros and cons of such deference, he stated:

> In my view the key to resolving the conflict in this case is the location. I agree with defense counsel that the same sequence of events occurring in the center of a suburban town would not have resulted in a stop by the police.... I have seen Hayward Place. It is a depressing and inhospitable location which one would hardly choose for a legitimate transaction.

For the district judge, then, the location was not only an important background element against which to interpret the specific facts, but the central "fact" itself. But this "fact," *i.e.*, the Combat Zone, does not carry the dispositive weight attributed to it, even aside from the holding in *Brown v. Texas*.[3] As the district judge noted:

> The case is complicated by the fact that the stop in this case occurred in the early afternoon, when there are legitimate businesses operating in the Combat Zone and Washington Street serves as a conduit for legitimate traffic to the downtown area. There are also many people in the Combat Zone for personal purposes that, while certainly not admirable, are not yet illegal.

District Court Opinion at 7–8. There is, moreover, a certain circularity to the reasoning concerning Hayward Place: that

2. If, on the night upon which they believed "Chevron" was likely to travel, sometime between 2 a.m. and 6 a.m., a large enclosed vehicle was seen to make an east-west-east round trip to and from a deserted point (milepost 122) on a deserted road (highway 86), the officers would stop the vehicle on the return trip. In a 4-hour period the officers observed only one vehicle meeting that description. And it is not surprising that when they stopped the vehicle on its return trip it contained "Chevron" and several aliens.

*Cortez*, 449 U.S. at 420–21, 101 S.Ct. at 696–97 (footnote omitted).

3. *Brown* presented some features similar to the present case. Police stopped one of two men who were walking away from one another in an alley in a "high drug problem area." The officers did not suspect the individual of any particular crime. *Brown* 443 U.S. 47, 99 S.Ct. 2637. The extent to which *Brown* may be distinguished depends on the characterization of the suspicions here. *See, e.g.*, my discussion *infra* at 117.

street is said to be an unlikely choice for a "legitimate transaction" but the main basis for concluding that there had been *any* transaction was that the car had stopped on Hayward Place.

The court cites appellant's conduct, as interpreted by trained police officers, as a second articulable basis for police suspicions. The paucity of the objectively suspicious elements of that conduct, however, means that the court is in fact according dispositive deference to the officers' discretion. To be sure, as the court correctly notes, the issue here is not whether appellant's conduct might be "consistent only with guilt." Yet the court would have us find reasonable suspicion on the basis of an unwarranted reliance on police judgment in the absence of persuasive objective facts. In nearly every reported case in which location played a critical role, significantly greater specific characteristics of the individuals detained or of the date, the time, or the location, supported the officers' judgment. *See, e.g., United States v. Rickus,* 737 F.2d 360 (3d Cir.1984) (car travelled abnormally slowly through closed business district at 3:30 a.m.; area had experienced a recent spate of robberies; car drove back and forth in front of stores, then stopped in front of residence); *United States v. Harley,* 682 F.2d 398 (2d Cir.1982) (specific building staked out over long period); *United States v. Gomez,* 633 F.2d 999 (2d Cir.1980) (detailed background information on suspects; car paused repeatedly for apparently prearranged meetings; agents stopped suspects only after determining destination of brown paper bag), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Constantine,* 567 F.2d 266 (4th Cir.1977) (1:40 a.m.; recent rash of vandalism), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978); *United States v. Magda,* 547 F.2d 756 (2d Cir.1976) (officer saw two men *exchange* something; one of the men walked away rapidly after looking in officer's direction; incident occurred near a park under 24–hour surveillance), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Santana,* 485

F.2d 365 (2d Cir.1973) (known prominent drug trafficker with brown bag exited restaurant known for narcotics transactions), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

Here, by contrast, we are asked to find reasonable suspicion on the basis of quite general characteristics of a sizeable area of the city, when the suspicion was not grounded in any specific information about date, time, or the particular individuals. Nor was there any finding that Hayward Place was a street known specifically for drug deals or other illegalities. The suspects did indeed commit the act of appearing to converse briefly on that street. Yet, although they are supposed to have gone to Hayward Place because it was deserted, they made no attempt to conceal themselves from a car that that had followed them into the deserted street and that had parked behind them with an unobstructed view of their car. Their failure to conceal themselves is particularly striking because the second car, which we now know was an unmarked police car, contained three men who were observing them and discussing their observations. It would seem that, for the court, the Combat Zone is a *per se* region of lessened expectation of privacy, at all times of the day and at all periods of the year, where practically unlimited deference is granted to police officers' discretion. More particularly, the court, following the district judge's views about where one would "choose" to conduct one's affairs, has effectively eliminated any fourth amendment scrutiny of police suspicions concerning activity on Hayward Place.

The test for a *Terry* stop cannot end at the evaluation of the suspicion but must balance that suspicion against the *nature* of the stop. As the Supreme Court has noted, "[s]treet encounters between citizens and police officers ... range from wholly friendly exchanges ... to hostile confrontations of armed men." *Terry,* 392 U.S. at 13, 88 S.Ct. at 1875. The factors justifying the particular kind of stop at issue, no less than those supporting the making of any stop at all, must be evaluat-

ed in light of *Terry's* specificity requirement. The court here seeks to justify the armed character of the stop due to the officers' reasonable fears for their safety. Two factors are cited to support this view: (1) "the officer suspected appellant of dealing in narcotics ... conduct rife with deadly weapons"; and (2) the nature of the location. I have already discussed the factor of the location but wish to make an additional observation. It seems strange that the record does not provide any explanation for the fact that the officers did not stop the suspect on Hayward Place but rather some distance away. Does this have some bearing on either the strength of the suspicions or on when those suspicions jelled in the officers' minds?

No less problematic, in light of *Terry's* specificity requirement, is the court's justification of the armed stop on the basis of the officers' suspicions of a narcotics transaction. The finding of a *specific* suspicion of a narcotics transaction is not wholly supported by the record. The district judge found only that the "officers believed that *some sort* of illegal transaction had occurred." District Court Opinion at 3 (emphasis added). The district judge appears to have phrased his finding in this way because of some uncertainty in the testimony about exactly what the officers suspected.[4] Moreover, when Officer McReynolds testified that the "nature of the transaction" influenced his use of a weapon, he was not necessarily referring to narcotics dealings and their association with deadly weapons. What he said was that "the transaction, the apparent transaction, was such that any easily concealable item could have been bought or sold or exchanged, including ... a weapon of some sort." Hearing on Motion to Suppress at 23. Indeed, when discussing the initial justification for the making of a stop, the court repeated the district judge's finding by stating that what the officers suspected was some "illegal transaction." The district court's finding of a reasonable suspi-

cion of "some sort of illegal transaction," itself based on rather general factors, becomes the justification for an armed stop on the basis of the officers' speculations about what such a transaction might have included.

The district judge stated his own finding about the weapon thus:

> McReynolds had a reasonable suspicion that an illegal transaction had just taken place in an area in which narcotics transactions frequently took place and in which people frequently were found to be armed.... Given the history of the Combat Zone, [drawing a gun] was elementary prudence.

This formulation expresses the way in which rather general ideas were connected to each other to yield the result in this case without much attempt to relate these ideas to the factual findings. For example, assuming the reasonableness of some suspicion, there were no findings concerning the kind of narcotics transactions that are fraught with danger. Are small-scale street transactions "rife with deadly weapons" or only large dealings involving professional traffickers? Is a meeting between two individuals which might involve "some sort of illegal transaction" fraught with danger for police officers? What basis is there in the record for any of the more generalized conclusions supporting the result here? Does "the history of the Combat Zone" concern both nighttime and daytime activities? I do not wish to engage in armchair second-guessing of police officers but think our conclusions should be based on findings which have direct support in the record.

The court cites *United States v. Harley*, 682 F.2d 398 (2d Cir.1982), for the elements to be considered in evaluating whether the force police employ converts a *Terry* stop into an arrest. I believe that test to be correct. Yet we may also look to the facts in *Harley* for some guidance as to the way

---

**4.** *See* Hearing on Motion to Suppress, at 16 (Officer McReynolds' testimony) and 38–40 (Officer Blais' testimony).

in which to *apply* the test. *Harley* involved a specific building under periodic surveillance by DEA agents for several weeks; informants had told of narcotics transactions; the agents motioned to a suspect to pull over and a high-speed car chase ensued; when agents caught up to the suspect, he reached behind him as though for a gun. At that point, the agents drew their weapons.

I would not, of course, limit the reasonableness of drawing a gun to such circumstances. Police officers must have the right to protect themselves. The drawing of guns by the police does not automatically convert an investigative stop into an arrest, although it may do so in certain circumstances. *Compare, e.g., United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir.1981) (drawing of guns "has been explicitly described as one of the 'trappings of a technical formal arrest'") (quoting *Dunaway v. New York*, 442 U.S. 200, 215 & n. 17, 99 S.Ct. 2248, 2258 & n. 17, 60 L.Ed.2d 824 (1979)), *with United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir.1984) ("display of guns does not automatically convert a stop into an arrest"). Yet when guns have been allowed in *Terry* stop situations, the officers' suspicions have usually been much more solidly based than here. *See, e.g., United States v. Santana*, 485 F.2d 365 (not unreasonable to assume that notorious New York narcotics violator might be armed). In circumstances presenting a basis for suspicion closer to the present case, courts have stressed the minimal nature of the intrusion in upholding the *Terry* stop. *See, e.g., United States v. Magda*, 547 F.2d 756, 759 (officer did not "physically restrain" nor "humiliate" suspect but "simply asked him to stop"); *United States v. Constantine*, 567 F.2d 266, 267 (officer motioned to suspect to approach police car).

The armed stop here seems to me to be quite disproportionate to the circumstances in view of the paucity of specific articulable facts. In *United States v. Ceballos*, 654 F.2d 177, an armed stop was held to be an arrest because of a similarly disproportionate police response. In that case, as in this, the suspect was

> completely unknown to the officers, was not reputed to be a major narcotics violator, [cites omitted], was not known to be armed or reasonably suspected of being armed; did not engage in erratic driving designed to avoid surveillance, and did not otherwise act in a way that would lead the officers reasonably to conclude that the degree of force used here was required to effect a *Terry* stop.

*Id.* at 184. *Ceballos* involved a specific basis for suspicion far higher than in the present case; the amount of force employed by police was, in some respects, lesser than here.[5]

While other courts have considered general characteristics of certain kinds of lawbreakers in analyzing the limits of a *Terry* stop, they have done so in cases presenting suspicions based on specific information. *See, e.g., United States v. Jones*, 759 F.2d 633, 640 (8th Cir.1985) (defendant had run when he saw police and was suspected accomplice of a known burglar; court found support for upholding armed *Terry* stop on "generalities" about burglars, *contra Ceballos* ), *cert. denied*, —— U.S. ——, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. White*, 648 F.2d 29, 43 (D.C.Cir. 1981) (anonymous tip with highly detailed information verified in large part by police observation), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981). *Cf., United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir.1975) (stop held to be an arrest when suspects ordered out of vehicle at gunpoint in narcotics case involving detailed informer's tip).

---

**5.** In *Ceballos,* the suspect had emerged late at night, with a brown paper bag, from the building of a known narcotics dealer who was under surveillance. The dissenting judge in that case, who would have upheld the stop under *Terry,* stressed this specific basis for the suspicion. In arguing that the force applied was not equivalent to an arrest, the dissent also noted that "[t]his is not a case in which one or more officers approached a suspect and ordered him out of his car at gunpoint [cites omitted]." *Ceballos* at 188 (Meskill, J., dissenting).

My review of the cases shows that, while there are no bright-line rules in these matters, suspicions and fears based on specific information are the hallmark of judicial application of the two-part *Terry* test. Balancing the paucity of such specificity here against the degree of force employed, I cannot agree that a lawful *Terry* stop was conducted. I have difficulty formulating the court's holding without seeming to exaggerate my brethren's intent: if a citizen lets another person into his car on Washington Street, where must he let him off to avoid an armed stop by the police? The court's opinion provides *no limiting criteria.* Rather, it seems to allow armed stops of individuals who meet in the Combat Zone on the basis of unlimited deference to police discretion.

I respectfully dissent.