UNITED STATES of America,

v.

Kwok–Wah CHAN, et al.

Crim. A. No. 93–10352–NMG.

United States District Court,
D. Massachusetts.

Sept. 25, 1995.

Robert L. Sheketoff, Sheketoff & Homan, Boston, MA, for Chao Va Fai.

James P. Brady, Hingham, MA, Jeffrey Denner, Cuddy Bixby, Boston, MA, for Vuong Ba Nguyen.

Nicholas C. Theodorou, Foley, Hoag & Eliot, Boston, MA, Kenneth J. King, Committee for Public Counsel Services, Children and Family Law Program, Salem, MA, for Chin Kan Sang.

Charles W. Rankin, Rankin & Sultan, Boston, MA, for Andrew Chu.

Joseph J. Balliro, Jr., Frank Mondano, Balliro & Mondano, Boston, MA, for Liu Ah Den.

Evan Slavitt, Hinckley, Allen, Snyder & Comen, Boston, MA, Richard M. Egbert, Law Office of Richard Egbert, Boston, MA, Frank Mondano, Balliro & Mondano, Boston, MA, for Szeto Sui Fong.

Norman S. Zalkind, Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, Boston, MA, James H. Budreau, Oteri Weinberg & Lawson, Boston, MA, for Hong Ming Kwong.

Richard N. Foley, Lynn, MA, for Lam Tien Yen.

Milly Whatley, Framingham, MA, Joseph J. Balliro, Jr., Balliro & Mondano, Boston, MA, for Lam Yuen Fat.

Tracy A. Miner, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Jimmy Soo Hoo.

Martin R. Rosenthal, Boston, MA, for Cheuk Man Tsang.

James W. Lawson, Oteri, Weinberg & Lawson, Boston, MA, Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, James E. McCall, Boston, MA, for Angela Tse.

Joseph S. Oteri, Oteri, Weinberg & Lawson, Boston, MA, Kevin J. O'Dea, Boston, MA, for Stephen Tse.

Stephen Hrones, Hrones & Harwood, Boston, MA, for Wei Hua Ye.

Susan C. Hanson–Philbrick, United States Attorney's Office, Boston, MA, for the U.S.

## MEMORANDUM AND ORDER

GORTON, District Judge.

Defendants Vuong Ba Nguyen and Wei Hua Ye have filed three separate motions to suppress evidence obtained during their arrests in this complex, multi-defendant criminal case. For the reasons stated herein, those motions will be denied.

## I. BACKGROUND

On December 21, 1993, a federal grand jury returned an indictment against sixteen defendants alleging that all of them were members of the "Ping On" gang. The government claims that Ping On was structured as a traditional Chinese triad secret society with approximately 150 members, 20 to 30 of whom comprise its nucleus. The Ping On allegedly engaged in racketeering activity including illegal gambling, extortion and conspiracy to commit murder.

The indictment specifically charges the defendants in this case with the following violations: 1) RICO (18 U.S.C. §§ 1962(c) and (d)); 2) illegal gambling (18 U.S.C. § 1955); 3) conspiracy (18 U.S.C. § 371); 4) extortion

(18 U.S.C. §§ 1951, 892(a) and 894(a)); and 5) use of a firearm in a crime of violence (18 U.S.C. § 1959(a)(5)). The indictment charges defendant, Vuong Ba Nguyen ("Nguyen"), with two counts of RICO, one count of illegal gambling, one count of extortion and five counts of using a firearm in a crime of violence. It charges defendant Wei Hua Ye ("Ye") with one count of gambling and one count of extortion.

## II. DISCUSSION

Nguyen has filed two motions to suppress. In the first motion, he seeks to suppress a .380 caliber Browning handgun and thirteen rounds of ammunition seized by Boston police officers during his arrest on January 1, 1989. In his second motion, Nguyen seeks to suppress a Colt Delta semi-automatic handgun seized by federal law enforcement agents when he was arrested on January 6, 1994, to face this indictment. Defendant Ye moves to suppress certain statements he made to agents of the Federal Bureau of Investigation after his arrest on January 6, 1994.

### A. Motion of Nguyen to Suppress Evidence Obtained During Warrantless Search and Seizure (January 1, 1989)

#### 1. Facts

At an evidentiary hearing conducted before the Court on July 6 and 7, 1995, Officer Michael Linskey and Detective Marc Cardozo, veteran patrolmen of the Boston Police Department, testified as follows:

a. On January 1, 1989, Officers Linskey and Cardozo (Cardozo has since been promoted to detective) reported to work for roll call at approximately 4:00 P.M. At roll call, the officers learned that a shooting had recently taken place on Tyler St. in the Chinatown section of Boston. The officers were informed that the shooting involved Asian gangs and that, as a result of the shooting, Chinatown had been deemed a "hot area." Consequently, the officers were advised to wear bullet proof vests.

b. After roll call, the uniformed officers began their shift by driving their marked police cruiser into the Chinatown area. At approximately 4:25 P.M., while they were patrolling Chinatown, the officers received a radio call from the police dispatcher directing them to the corner of Beach and Oxford streets to investigate a report of a man with a gun at that location. That corner is close to the site of the earlier shooting.

c. Less than one minute later, as they approached the intersection of Beach and Oxford, the officers observed three Asian men "huddled" together on the corner. Although it was dusk on a cold night in January, the three men were wearing only light jackets and were standing on the corner for "no apparent reason." (There was no bus stop, subway entrance, store window or other diversion at the corner.)

d. The three unidentified men dispersed immediately upon making eye contact with the officers, who were still approaching in their patrol car. The officers stopped their car and pursued two of the three men. (The third unidentified man left the scene without being identified.) Officer Linskey caught up to one of the men and asked him several questions, but the second individual, who was later identified as the defendant, Nguyen, continued to walk away quickly.

e. Officer Cardozo followed Mr. Nguyen and yelled loudly for him to stop. The defendant looked over his shoulder at the officer, but nevertheless continued to walk away at a rapid pace. Officer Cardozo increased his pace and positioned himself in front of the defendant. Nguyen stopped, but turned to walk away. Officer Cardozo, however, prevented his departure by grabbing his arm and ordering him to stand still. Officer Cardozo then conducted a pat down search of the defendant out of a perceived concern for his safety and the safety of others. The officer discovered a black handgun with a brown handle in Nguyen's waistband and then placed the defendant under arrest.

#### 2. Analysis

Nguyen argues that the gun seized by Officer Cardozo should be suppressed because it was discovered during an unconstitutional stop. The Court disagrees.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that, before a police officer may stop and search a person for weapons, that officer must have a reasonable suspicion that the person is engaged in criminal activity and is armed. The Court further explained that the officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. Finally, the search "must be justified by reasonable suspicion proportional to the degree of the intrusion." *United States v. Trullo,* 809 F.2d 108, 110 (1st Cir.1987).

This Court, therefore, must make two inquiries: 1) was Detective Cardozo's initial stop of the defendant justified, and 2) if so, was the ensuing search related in scope to the circumstances necessitating the stop. *See Id.* at 111. In determining whether the stop and search was reasonable in this case, the Court does not dissect the factors confronting Detective Cardozo and evaluate them singly, but rather considers all of the circumstances relating to the stop as a whole. *See Id.*

The Court credits the unchallenged testimony of Officer Linskey and Detective Cardozo. That testimony indicates that:

a) The officers were aware there had been a recent shooting, allegedly by Asian gangs, only one block from the corner where they noticed the defendant. *See Id.* (reputation of a location is a factor upon which an officer may rely).

b) The officers received a call that a man had a gun on the corner of Beach and Oxford streets. *See United States v. Clipper,* 973 F.2d 944, 947 (D.C.Cir.1992) (anonymous tip may justify a stop).

c) The defendant and two other men were "huddled" on the corner to which the officers had been directed and were wearing light clothes on a cold January night. They dispersed immediately upon making eye contact with the officers. *See United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993) (finding reasonable suspicion where a group of men on a street corner in a high crime area dispersed upon seeing a

police officer); *United States v. Viegas,* 639 F.2d 42, 45 (1st Cir.1981) (seemingly innocent behavior is not inconsistent with finding reasonable suspicion).

d) The defendant ignored Cardozo's orders to stop, and, after Cardozo caught up to him, the defendant turned to walk away. *See United States v. Pope,* 561 F.2d 663, 669 (6th Cir.1977) (flight from a police officer may contribute to reasonable suspicion); *see also California v. Hodari D.,* 499 U.S. 621, 623 n. 1, 111 S.Ct. 1547, 1549 n. 1, 113 L.Ed.2d 690 (1991); *cf. United States v. Ferreira,* 821 F.2d 1, 4–5 (1st Cir.1987) (flight from an *unidentified* police officer is not a reflection upon the suspect's guilt).

Based upon the testimony of Officer Linskey and Detective Cardozo, the Court concludes that, taken as a whole, the circumstances of this case were sufficient to constitute reasonable suspicion on the part of the defendant. The Court, therefore, finds that Detective Cardozo had the authority, and, perhaps, the responsibility, to stop the defendant in the first instance. The Court further finds that Detective Cardozo's ensuing search of the defendant, where he merely patted down the waist area of Nguyen to check for a possible weapon, was reasonable and proportional in scope to the suspicion raised by the defendant and the overall circumstances of the stop. *See Trullo,* 809 F.2d at 110–111. Accordingly, Nguyen's first motion to suppress, based upon the search and seizure of January 1, 1989, will be denied.

**B. Motion of Nguyen to Suppress Evidence Obtained During Warrantless Search and Seizure (January 6, 1994)**

**1. Facts**

The Court heard evidence on Nguyen's second motion to suppress on July 7, 1995. Based upon the unchallenged testimony at that hearing of Special Agent Russell Young of the Immigration and Naturalization Service ("INS"), and Special Agents Darryl Radt and Krista Thomas of the Federal Bureau of Investigation ("FBI"), the Court finds the following facts:

a. At sometime prior to January 6, 1994, the government applied for and obtained a warrant for the arrest of the defendant, Nguyen, in connection with the indictment in this case. On the morning of January 6, 1994, the government assembled an arrest team to effect that warrant. The arrest team was comprised of Special Agent Young of the INS and Special Agents Radt, Thomas, Madisek and Decker of the FBI. Before leaving FBI headquarters, the arrest team received a briefing on the defendant and on the planned arrest.

b. The team arrived at the defendant's home, located at 7 Mt. Vernon St., at approximately 7:00 A.M. Agents Radt, Young and Thomas rang the doorbell several times and waited for a response. (The other agents positioned themselves around the front and the rear of the building.) After several minutes, a woman who was apparently defendant's neighbor, appeared at her front door. She informed Agents Radt, Young and Thomas that the defendant lived on the third floor of the building and offered to call him on her telephone to wake him up.

c. Soon after the woman reentered her apartment, a young man answered the door to the defendant's apartment. That man told the agents that he believed the defendant was on the third floor. Agents Young and Radt followed the man, later identified to be the defendant's brother, up the stairway. Agent Thomas remained at the bottom and maintained communication with the other agents.

d. When Agents Young and Radt reached the top of the stairs, the defendant's brother went to the end of the hallway and motioned to a room. The agents proceeded down the hall more slowly, checking other rooms and closets as they went. When the agents reached the last room, they saw a person (later identified as the defendant) lying underneath the covers of a bed. Agents Young and Radt ordered the defendant, in English, to get out of bed and to show them his hands. The defendant complied with the agents' orders. The agents then led the defendant into the kitchen of his apartment, where they sat him down and asked him several questions.

e. While Agents Radt and Young began questioning the defendant, the other agents began "clearing" (i.e., securing) the rest of the apartment. At some point, Agent Young asked the defendant to produce his alien registration card. The defendant did not have the card on his person, but motioned to his bedroom. The agents took the defendant back into his bedroom where he directed them to the identification card. The agents were convinced that the card identified the defendant as the subject of the arrest warrant and, therefore, placed him under arrest and handcuffed him.

f. The agents took the defendant back to the kitchen. They had not yet read the defendant his *Miranda* rights, but were rather focused on securing the apartment. To that end, the agents asked the defendant whether he had a gun. The defendant nodded his head affirmatively and pointed back toward his bedroom. The agents once again took the defendant to his bedroom and asked him where the gun was. The defendant motioned with his head and pointed with his foot to a chest of drawers in his closet. Agent Thomas searched the chest and discovered the subject gun.

### 2. Analysis

In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court carved out the "public safety" exception to the traditional *Miranda* rule. In *Quarles,* a woman reported to two police officers that she had been raped by a man in a black jacket. She informed the officers that the man had a gun and had just entered a nearby supermarket. One of the officers entered the store, found a man matching the woman's description and arrested him. When the officer frisked the suspect, he discovered an empty holster but no gun. After handcuffing the suspect, and after three other officers had arrived at the scene, the arresting officer asked the suspect where the gun was, even though the suspect had not yet been read his *Miranda* rights. The suspect told the police where the gun was, and it was subsequently retrieved by the arresting officer. *Id.* at 651–52, 104 S.Ct. at 2629.

■ The New York state court suppressed the gun, because the arresting officer had not

read the suspect his *Miranda* rights before asking him about the gun's location. *Id.* at 652–53, 104 S.Ct. at 2629–30; *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court, however, reversed. The Court explained that, because the *Miranda* rule is a procedural safeguard and not a right in and of itself, *see Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182 (1974), there are situations where the need for answers to questions regarding public safety outweighs the need for the prophylactic *Miranda* warnings. *Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632. The Court stated:

> we do not believe that the doctrinal underpinnings of *Miranda* require us to exclude the evidence, thus penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public.

*Id.* at 658, n. 7, 104 S.Ct. at 2632, n. 7.

Even though the suspect in *Quarles* was 1) handcuffed, and 2) surrounded by at least four police officers, the Court concluded that the circumstances of the case, where the location of the gun was still unknown, justified the questioning of the suspect before the recitation of *Miranda* warnings. *Id.* at 657–59, 104 S.Ct. at 2632–33. The Court reasoned that, as long as the location of the gun was unknown, it posed a danger to the public; an accomplice could have used it, or an innocent third-party could have "come upon it." *Id.* at 657, 104 S.Ct. at 2632.

■ In the case at bar, the defendant, like the suspect in *Quarles*, was handcuffed and surrounded by at least two agents. Nevertheless, this Court concludes that, as in *Quarles*, the "public safety" exception to the traditional *Miranda* rule applies.

The evidence at the hearing on this motion indicated that, at the briefing before the arrest, the agents had learned that the de-fendant was allegedly an "enforcer" of a violent street gang and was charged with offenses involving firearms. Even after they had arrested the defendant, the agents had not determined definitively how many people were in the apartment. They had not been able to open a door in the kitchen (dogs were barking behind that door), and the defendant's brother was not restrained. Moreover, there were neighbors, and possibly accomplices, in the vicinity. Under such circumstances, the Court finds it reasonable for the agents to be concerned for their safety. As the Supreme Court stated in *Quarles*, the agents should not now be penalized for "asking the very questions which [were] the most crucial to their efforts to protect themselves and the public." *Id.* at 658, n. 7, 104 S.Ct. at 2632.

In sum, the Court finds that the threat in this case to the agents and potential third-parties equals or exceeds the threat to the public in *Quarles*.[1] The Court, therefore, concludes that the agents had the authority to ask the defendant whether he had a gun nearby without violating the defendant's Fifth Amendment right against self-incrimination. *See Id.*; *see also United States v. Edwards*, 885 F.2d 377, 384 (7th Cir.1989).

■ The Court further finds that, based upon the agents' testimony, the defendant's consent to the search was knowing and voluntary, and was not brought about through any improper threats or coercion. *See United States v. Wilkinson*, 926 F.2d 22, 25 (1st Cir.1991) (suspect's will was not "overborne," despite officer's threat to "tear the place apart"); *see also United States v. Caballero*, 936 F.2d 1292, 1297 (D.C.Cir.1991).

Finally, because the defendant consented to the search at issue, the Court concludes that it and the ensuing seizure of the subject gun did not violate the defendant's Fourth Amendment rights. *See United States v. Morris*, 977 F.2d 677, 688 (1st Cir.1992).

---

1. In explaining its decision in *Quarles*, the Supreme Court reasoned that police officers can instinctively distinguish between those permissible questions "necessary to secure their own safety *or* the safety of the public" and those impermissible questions designed to "elicit testimonial evidence from a suspect." *Quarles*, 467 U.S. at 658–59, 104 S.Ct. at 2632–33 (emphasis supplied). Thus, the Court implicitly assumed, through the disjunctive "or," that the public safety exception to *Miranda* is applicable even if only police officers, as opposed to members of the public, are threatened. Accordingly, the exception would apply in the present case even if only the agents were threatened.

Accordingly, Nguyen's second motion to suppress evidence discovered during the search and seizure of January 6, 1994, will be denied.

### C. Motion of Wei Hua Ye to Suppress Statements

In the early morning hours of January 6, 1994, a team of federal agents from the INS and the FBI arrested the defendant, Ye, at his apartment in Chelsea pursuant to an arrest warrant. After the agents arrested and handcuffed Ye, they performed a protective sweep of Ye's room. The agents did not discover any weapons and seized no evidence.

The agents transported Ye to FBI headquarters in Boston and put him into a standard, upstairs office. The office had windows, a desk and several chairs. After defendant's handcuffs were removed, Special Agent Robert Callen of the FBI read the defendant his *Miranda* rights. One of the agents present then asked Ye to sign a form waiving those rights. Ye initially refused to sign the form, which was written in English, but, shortly thereafter, agreed to sign a similar waiver form written in Chinese. *See* Exhibit 3.

The agents proceeded to ask the defendant, who did not appear to be under the influence of any drugs or alcohol, various questions, but they did not threaten the defendant. During the interrogation, which was conducted in English, the agents gave the defendant coffee and muffins and allowed him to use the bathroom and to make a phone call.

Based upon those facts, the defendant argues that this Court should suppress Ye's statements to the FBI agents, even though 1) the agents had read Ye his *Miranda* rights in English, and 2) Ye had signed a waiver form in Chinese. The defendant contends that the agents' protective sweep of his apartment (during which the government did not seize any evidence) violated his constitutional rights and, in some way, warrants the suppression of the defendant's subsequent statements to the FBI. In addition, Ye asserts that he was coerced into "confessing."

The defendant's motion is without merit. Even if the protective sweep of Ye's apartment had violated his constitutional rights (and this Court finds that it did not), that sweep was entirely irrelevant to Ye's subsequent waiver and confession. Furthermore, this Court credits the unchallenged testimony of the special agents at the hearing on July 6, 1995. Based upon that testimony, the Court finds that the defendant's waiver of his constitutional rights was voluntary, knowing and intelligent. *See Colorado v. Connelly,* 479 U.S. 157, 167–71, 107 S.Ct. 515, 521–24, 93 L.Ed.2d 473 (1986). The Court, therefore, will deny Ye's motion to suppress certain statements that he made to the FBI after his arrest on January 6, 1994.

### ORDER

For the foregoing reasons, this Court ORDERS that:

1.  the motion of defendant Nguyen to suppress evidence seized from his person on January 1, 1989, is DENIED;

2.  the motion of defendant Nguyen to suppress evidence seized from his apartment on January 6, 1994, is DENIED; and

3.  the motion of defendant Ye to suppress certain statements that he made to the FBI on January 6, 1994, is DENIED.

So Ordered.