UNITED STATES of America, Appellee,

v.

James GILLIARD a/k/a Jimmy Gillard,
Defendant, Appellant.

No. 87–1893.

United States Court of Appeals,
First Circuit.

Heard April 5, 1988.

Decided May 26, 1988.

Fred A. Kelly, Jr., with whom J. William Codinha, by Appointment of the Court, Gregory P. Deschenes and Peabody & Brown were on brief for defendant, appellant.

Martin F. Murphy, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., was on brief for appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

James Gilliard appeals his conviction under 18 U.S.C. § 922(g) for unlawful possession of a firearm by a convicted felon. Pursuant to the recidivist provisions of 18 U.S.C. § 924(e), Gilliard was sentenced to fifteen years imprisonment without the possibility of parole. Gilliard makes three arguments on appeal: (1) that the district court erred in not suppressing evidence seized by the police during an investigative stop of Gilliard; (2) that the fifteen-year sentence constitutes cruel and unusual punishment under the eighth amendment; and (3) that the government failed to prove that the firearm in question travelled in or affected interstate commerce. We affirm.

## I. BACKGROUND

On January 15, 1987, the Boston Police Department's Drug Control Unit received an anonymous tip that there was ongoing "heavy" drug traffic at the corner of Geneva Avenue and Bowdoin Street in Dorchester, Massachusetts. Two officers were dispatched to the scene. Wearing plain clothes and driving an unmarked car, the officers parked near the intersection to watch for possible drug sales.

At approximately eight o'clock that evening, Gilliard and a companion arrived by automobile at the corner. Gilliard, who was driving, parked the car nearby and walked across the intersection to a garage at 140 Bowdoin Street. The two police officers observed Gilliard as he exited the car and walked across the street to speak with an Hispanic male. During their brief conversation, Gilliard handed to the male what appeared to the officers to be United States currency. Gilliard then proceeded to a nearby store, emerged with a paper bag, and returned to speak with the same Hispanic male. The Hispanic male placed something into the paper bag, and Gilliard returned to the car.

Believing that they had just witnessed an illegal drug transaction, the two police officers pulled their car behind Gilliard's, blocking him in, and then approached his car on either side on foot. The officer on the driver's side identified himself to Gilliard as a Boston police officer and asked Gilliard for his driver's license and automobile registration. Gilliard reached into his back pocket for his wallet and attempted to remove his license, but was shaking nervously and unable to do so. As a protective measure, the officer then asked Gilliard to step out of the car and gave him a pat frisk. During the frisk, the officer felt a large, hard object and, reaching into the inner pocket of Gilliard's jacket, discovered a fully loaded .25 caliber handgun. Gilliard was handcuffed, advised of his *Miranda* rights and placed in the police car. After acknowledging that he understood his rights, Gilliard, in response to a question, told the officers that he had purchased the handgun for fifty dollars at the corner of Washington Street and School Street in Jamaica Plain.

Although initially charged with violation of Massachusetts state law, Gilliard was never tried on those charges. Instead, he was indicted in federal court for violation of 18 U.S.C. § 922(g), which makes it illegal for any convicted felon to possess a firearm that has travelled in or affected interstate commerce. The indictment also charged Gilliard with violation of 18 U.S.C. § 924(e)(1), a special statute providing stiffer sentences for violations of section 922(g) by recidivists:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, such person shall be fined not more than $25,000 and impris-

oned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g), and such person shall not be eligible for parole with the respect to the sentence imposed under this subsection.

Prior to trial, Gilliard moved to suppress the gun and the statements he had made about it as fruits of an illegal search. A suppression hearing was held by the district court in July of 1987. Both police officers testified about the surveillance and the events surrounding Gilliard's arrest. They also testified that the informant who gave them the tip concerning drug sales at Geneva Avenue and Bowdoin Street—known only to the officers as "It's Me"—had previously given the police information about drug sales in the Dorchester area. Each of these tips had indeed led the police to areas of drug sales and some had led to arrests. "It's Me" had never given the police false leads. Moreover, the officers testified that they knew from previous experience with the Drug Control Unit that the Geneva and Bowdoin corner was "a high-drug-sale area." In support of his motion to suppress, Gilliard presented the testimony of Margaret Soeyfet, his companion in the car at the time of his arrest, who gave a sharply different version of the events of January 15, 1987.

Crediting the officers over Soeyfet, the district court denied the motion to suppress. The court found, first, that based on the background information available to them as well as their observations of the scene, the officers had probable cause to believe that a drug transaction had occurred and hence to arrest Gilliard and search the car. Second, and in the alterna-

tive, the court ruled that based on the same criteria, the police had reasonable articulable suspicion to support an investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Once that stop was made, the court ruled, the officers also acted reasonably by frisking Gilliard after observing his nervous and erratic behavior in the car. Either way, the court said, the police properly discovered the handgun.

By agreement of the parties, the trial was divided into two phases. During the first phase, the government introduced evidence related solely to Gilliard's possession of the handgun in violation of section 922(g).[1] The two officers testified essentially as they had at the suppression hearing. The government also presented the testimony of Charles Mudd, an employee of Baretta U.S.A. Corporation, the manufacturer of the handgun found on Gilliard. Mudd testified that the weapon seized bore the serial number BE31733V and that, according to the shipping records of Baretta provided by Mudd, this particular handgun had been shipped at one point from Maryland to Massachusetts. The jury returned a guilty verdict.

During the second phase, the issue was whether Gilliard had been convicted thrice previously of violent felonies, subjecting him to the enhanced penalty provisions of section 924(e).[2] Certified copies of three convictions—one for assault and battery with a dangerous weapon and two for robbery—were produced. The jury returned a second guilty verdict. On September 8, 1987, Gilliard was sentenced to the minimum of fifteen years imprisonment under section 924(e). Following the denial of post-trial motions for acquittal and for new trial, this appeal was taken.

1. For purposes of the first phase only, Gilliard stipulated that he was a convicted felon within the meaning of section 922(g).

2. A number of courts of appeals have recently considered the issue of whether section 924(e) creates a substantive offense that must be alleged in an indictment and proven, or whether it merely serves as a penalty enhancement provision to be applied by the district court in

sentencing, and have reached divergent conclusions. *Compare, e.g., United States v. Brewer,* 841 F.2d 667 (6th Cir.1988) (substantive offense) *with United States v. Hawkins,* 811 F.2d 210, 217–20 (3d Cir.) (penalty enhancement only), *cert. denied,* —— U.S. ——, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987). We express no opinion on this question which is not before us.

## II. DENIAL OF THE MOTION TO SUPPRESS

Although the district court made alternative findings to support its denial of the motion to suppress, Gilliard addresses his appellate argument only to the *Terry* stop issue. Gilliard maintains that the police officers lacked reasonable articulable suspicion to support an investigatory stop. We disagree, finding that the facts in this case make out a much stronger case of reasonable suspicion than "the outermost reaches of a permissible *Terry* stop" we established in *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). Accordingly, we find that there was no error in the district court's *Terry* stop ruling. We, therefore, need not decide whether there was probable cause for an arrest *before* the handgun was found.

■ There are two prongs to Gilliard's *Terry* argument. First, he claims that the police officers' testimony that Gilliard appeared to hand money to the Hispanic male is inherently incredible and should not be believed. Gilliard points out that this observation was made at eight o'clock in the evening from a distance of 125 to 150 feet and through a car window without any vision enhancement devices. Given these conditions, Gilliard argues, we should overturn the district court's finding that the officers' observations "support an inference that currency had been passed."

"[F]indings by a district court in a suppression hearing are binding on appeal unless they are clearly erroneous." *United States v. Wiseman*, 814 F.2d 826, 828 (1st Cir.1987). Here, the challenged finding by the district court was based solely on the testimony of the two police officers and amounted to a decision that their testimony was credible. Such credibility determinations "are lodged firmly in the province of the district court and we are loathe to disturb them absent a compelling showing of error." *Scarpa v. Murphy*, 806 F.2d 326, 328 (1st Cir.1986). We find no clear error here. To begin with, Gilliard has provided no factual or scientific basis for his claim that a transfer of currency by hand could not have been observed under the conditions specified. Without such a basis, we are in no position to second-guess testimony found credible by the district court. Certainly the claimed observation is not so inherently unreasonable that it must be a fabrication. We also think it significant that the officers did not testify to having positively identified an exchange of United States currency, but merely to having seen what "appeared" to be currency. This testimony is reasonable and supports the inference that an exchange actually occurred.

■ Gilliard's second, and principle, argument for suppression is that, even given all the facts as found by the district court, there was not a sufficient basis for a *Terry* stop and pat frisk. In *Terry v. Ohio*, 392 U.S. at 25–27, 88 S.Ct. at 1882–83, the Supreme Court recognized that the fourth amendment protects citizens from police encounters short of a full scale arrest. Such intrusive encounters must be justified by reasonable suspicion by the police and that suspicion must be proportional to the degree of intrusion undertaken. *Id.* at 19, 88 S.Ct. at 1878; *see also Trullo*, 809 F.2d at 110–11. The officers' reasonable suspicion may not be based on gut instinct; "the police officer must be able to point to specific and articulable facts which, taken together with all rational inferences from those facts, reasonably warrrant ... intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

■ In reviewing the reasonableness of a *Terry* stop, a court must consider all of the relevant circumstances, *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), which "are not to be dissected and viewed singly; rather they must be considered as a whole." *Trullo*, 809 F.2d at 111 (quoting *United States v. Magda*, 547 F.2d 756, 758 (2d Cir.1976) (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976)), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977)). Such review encompasses two inquiries: first, whether the officers' action was justified at its inception; and, second, whether the action taken

was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879). In this case, two different intrusions are involved and must be viewed separately: first, the officers' stopping and questioning of Gilliard; and, second, the pat frisk. With respect to each, we think that *Trullo* is controlling.

In *Trullo,* two Boston police officers and a federal agent observed the defendant, Trullo, meet another individual while Trullo was driving his car in Boston's Combat Zone. *See* 809 F.2d at 109–10. The other individual got into Trullo's car, had a short conversation with him, and then the two drove approximately two blocks and had another short conversation with their heads inclined toward each other. The passenger then exited the car. The police officers approached Trullo's car on foot and asked him to step out of the car. When he did, they noticed a bulge in his pants pocket. A pat frisk revealed an illegal spring-activated knife and Trullo was placed under arrest. *Id.* at 110.

In upholding the officers' actions as proper under *Terry,* the majority applied a three-part analysis. First, it held that the initial stop was proper because the officers had a reasonable articulable suspicion that the defendant had engaged in an illegal drug transaction. *Id.* at 111–12. That suspicion was based both on the place where the meeting between Trullo and the other individual took place—the Combat Zone, a high crime area known to be a center of narcotics sales—and the unusual and furtive nature of the meeting. Second, the court held that the scope of the intrusion—stopping the defendant and asking him to step out of his car—was reasonable and proportional to the suspicion. *Id.* at 113. Third, it was held that the pat frisk was also a reasonable intrusion based on the sighting of the bulge combined with the common knowledge that drug traffickers often carry deadly weapons. *Id.* at 113–14.

A similar analysis of the facts in this case amply supports the district court's ruling. With respect to the initial stop, the officers here did not rely simply on the general reputation of a neighborhood, as they did in *Trullo;* they acted pursuant to a specific lead from a source of proven credibility. Moreover, the observations of Gilliard revealed much more incriminating behavior than the short conversation between the two individuals in *Trullo;* the officers here actually witnessed what appeared to be an exchange of currency followed by the placing of an unknown substance into a bag carried by Gilliard. The extent of the intrusion was also quite reasonable by *Trullo* standards. Whereas in *Trullo* the officers approached the car with guns drawn and immediately asked the defendant to step out of the car, *id.* at 113, the officers here did not brandish weapons and did not immediately ask Gilliard to step out of the car; they simply asked him to show them his license and registration.

Finally, the decision to frisk Gilliard was based on reasonable suspicion and was proportional in scope. As in *Trullo,* the officers here suspected Gilliard of having participated in a narcotics sale and knew that firearms are "tools of the trade." *Id.* at 113 (quoting *United States v. Oates,* 560 F.2d 45, 62 (2d Cir.1977)). Moreover, Gilliard acted peculiarly and nervously in searching for his driver's license, moving, as the district court found, "his hands around his chest area and looking back and forth in an excited manner at the officers on two sides." It was thus reasonable for the officers to take the precautionary step of a pat frisk to insure that Gilliard was not armed. In argument to this court, Gilliard makes much of the fact that, unlike Trullo, he did not have any visible bulges clueing in the officers to his gun possession. But we think this distinction is unimportant. In *Trullo* the bulge was a significant factor because the officers had little other reason to believe that the defendant was dangerous. Here, however, the officers had a very well-founded suspicion of drug activity which, coupled with Gilliard's nervous behavior, gave rise to a legitimate and specific concern for personal safety.

We conclude that the officers acted properly in stopping and frisking Gilliard. The district court's denial of the motion to suppress was not error.

## III. EIGHTH AMENDMENT CLAIM

■ Gilliard mounts a facial attack on 18 U.S.C. § 924(e) as violative of the eighth amendment's prohibition on cruel and unusual punishment. Section 924(e) is the amended version of a provision contained in the Armed Career Criminal Act of 1984 (ACCA).[3] ACCA is a recidivist statute whose stated purpose was to infuse federal law enforcement into efforts at curbing and "incapacitating" "armed, habitual (career) criminals." See H.Rep. No. 1073, 98th Cong., 2d Sess. 1, 2 (1984), reprinted in, 1984 U.S.Code Cong. & Admin.News 3661, 3662. Only persons who are illegally in possession of a firearm and who have been convicted previously of three violent felonies or serious drug offenses are subject to its minimum fifteen-year sentence.

Gilliard downplays the recidivist backdrop for section 924(e) and, instead, focuses on the fact that the actual criminal conduct implicating section 924(e) is simple possession. Relying on the tripartite analysis employed in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), Gilliard argues that fifteen years imprisonment without the possibility of parole is grossly disproportionate to the crime of possession: first, fifteen years is many times longer than the sentences normally handed down for violation of federal handgun possession laws (absent three predicate felonies); second, the sentence far exceeds those imposed on defendants convicted in federal court for more serious felonies; and, third, fifteen years is a much more harsh sentence than the sentences for handgun possession, even by recidivists, in other jurisdictions.

We begin our analysis with the admonition by the Supreme Court that "successful challenges to the proportionality of sen-

tences have been exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980). Moreover, the Court has explicitly noted a special and legitimate government interest in enhanced penalties for recidivist criminals.

The purpose of a recidivist statute ... is not to simplify the task of prosecutors, judges, or juries. Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense, but also on the propensities which he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.

Id. at 284–85, 100 S.Ct. at 1144–45.

In both Solem and Rummel, the Court confronted the question of proportionality under recidivist criminal statutes in noncapital cases. The defendant in Rummel received a life sentence after being convicted of obtaining $120.75 by false pretenses. He had been convicted twice previously of similar property crimes (fraudulent use of a credit card and passing a forged check) causing a total loss of $108.36. 445 U.S. at 265–66, 100 S.Ct. at 1134–35. The Court found that the sentence comported with the eighth amendment. Id. at 285, 100 S.Ct. at 1145. In Solem, the defendant also received a life sentence for a property crime: uttering a "no account" check for $100. He had been previously convicted of six nonviolent crimes ranging from burglary to driving while intoxicated. 463 U.S. at 279–

---

**3.** Amendments to ACCA were made in the Firearm Owners' Protection Act of 1986, P.L. 99–308. The relevant provisions were then recodified in section 924(e) and the predicate offenses for ACCA's minimum fifteen-year sentence were expanded to include all violent crimes and serious drug offenses instead of just robbery and burglary.

82, 103 S.Ct. at 3004–05. The Court held that this sentence was "significantly disproportionate" to the crime and was prohibited by the eighth amendment. *Id.* at 303, 103 S.Ct. at 3016. The sole factor identified by the Court to distinguish the two cases was that the defendant in *Rummel* was eligible for parole after twelve years imprisonment. *Solem,* 463 U.S. at 300–03, 103 S.Ct. at 3014–16; *Rummel,* 445 U.S. at 280, 100 S.Ct. at 1142. The defendant in *Solem* would never have been eligible for parole. 463 U.S. at 282, 103 S.Ct. at 3005.

Pointing out that he, too, is ineligible for parole, Gilliard argues that we should strike down section 924(e) on the basis of *Solem.* We disagree. Indeed, Gilliard's punishment seems more proportional to his crime than the punishment in *either Rummel* or *Solem.* Unlike the defendants in those cases, Gilliard has been convicted three times of violent crimes, not merely crimes involving property deprivation. Section 924(e) focuses on such violent crimes and seeks to insure that violent felons no longer possess firearms, a ready conduit for their proven violent propensities. Gilliard has been sentenced to fifteen years, not life, imprisonment; fifteen years is certainly a substantial period of time, but it is approximately equal to the time the nonviolent criminal in *Rummel* would have spent in prison before being eligible for parole.

Nor are we persuaded by Gilliard's argument that the conduct underlying his conviction is not a criminal "act," only criminal "possession." The decision whether and how to criminalize possession of a handgun (with an eye towards preventing its use), as opposed to criminalizing the actual use itself, is the kind of subjective determination that, the *Rummel* Court said, falls "properly within the province of legislatures, not courts." 445 U.S. at 275–76, 100 S.Ct. at 1140. Indeed, in *Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982), the Supreme Court upheld a forty-year sentence following conviction for possession of nine ounces of marijuana. The *Hutto*

Court in no way drew bright lines between "possessory" and "active" crimes, and we find no basis for doing so here.

Applying the *Solem/Rummel* standard, we hold that the minimum fifteen-year sentence imposed under section 924(e) does not violate the eighth amendment. *See United States v. Veloz,* No. 86 CR 323 (N.D.Ill. Sept. 16, 1986) [available on WESTLAW, 1986 WL 10637] (upholding the predecessor to section 924(e) against an eighth amendment challenge).

## IV. PROOF OF EFFECT ON INTERSTATE COMMERCE

■ Gilliard's last argument is an attack on the sufficiency of the evidence; he claims that the government failed to prove that the weapon in question travelled in or affected interstate commerce, a prerequisite for liability under 18 U.S.C. § 922(g). To support this claim, Gilliard points out that the indictment charged him with possession of a Baretta handgun bearing the serial number BE31733V and that the government produced evidence tending to establish that this particular gun travelled in interstate commerce. But, argues Gilliard, the two police officers testified at trial that the gun found on Gilliard had an altered serial number, which might be read either as BE31*5*33V or BE31*7*33V. Claiming it is "equally likely that the firearm's serial number was BE31*5*33V as it was BE31*7*33V," and that the government presented no proof of interstate travel for the former weapon, Gilliard says his conviction must be reversed.

This argument must be rejected. Even given just the evidence as outlined by Gilliard, the jury could have reasonably concluded, as it must have in order to convict him on the indictment presented, that Gilliard possessed the BE31*7*33V serial number handgun. Moreover, Charles Mudd, the Baretta employee, specifically testified that he had inspected the weapon and found that it bore the serial number BE31*7* 33V.[4] The evidence presented amply supports the

---

4. Ironically, Gilliard's counsel objected at trial to this testimony on the ground that there was

no disputable issue of fact concerning whether the serial number could be read, and thus that

jury finding that the weapon travelled in interstate commerce.

*Gilliard's conviction is affirmed.*

the jury members could read the number for

themselves. This objection was overruled.