**UNITED STATES of America, Plaintiff,**

v.

**Lorenzo HERNÁNDEZ LÓPEZ, Defendant.**

**Crim. No. 89–266 (JP).**

United States District Court, D. Puerto Rico.

Feb. 18, 1991.

Salixto Medina Malavé, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

Frank Inserni, Hato Rey, P.R., for defendant.

OPINION AND ORDER

PIERAS, District Judge.

The Court has before it the defendant's appeal from the Report and Recommendation of the magistrate recommending that his motion to suppress evidence be denied.

Defendant has invoked the Fourth Amendment in attempting to suppress the evidence seized at the time of his arrest and thereafter. This evidence forms the basis of defendant's arrest and indictment. Defendant first argues that the arresting officers did not have reasonable suspicion or sufficient articulable facts to conclude that the defendant was driving without a license and therefore violating local motor vehicle laws. He also contends that the weapon found on his person at the time of his detention was not "in plain view" of the policemen, and therefore not subject to seizure. Finally, the defendant challenges the government's assertion that the decks of heroin which were found in his car after he was arrested and brought to the police were found pursuant to a valid and routine "inventory search" of his automobile. For the reasons stated below, we grant defendant's motion.

## I. SUMMARY OF THE FACTS AND PROCEDURAL HISTORY

### A. *Facts*

On July 18, 1989, the defendant, Lorenzo Hernández López, also known as Mr. "Cano Bufi" to the officers of the Narcotics and Drugs Division of the Ponce Division of the Puerto Rico Police, was driving along Road 14 in front of El Porvenir, in the direction of Río Chiquito Road. The defendant, wearing a cast on his left arm, was driving a gray 1989 Toyota Tercel with tinted windows. He was accompanied by Madeline Rivera Rivera, the sister of one of his friends. At approximately 8:55 a.m., four agents in an unmarked police car noticed the defendant's car. The agents, José Méndez Crespo, Julio Pérez Tirado, Wilfredo Garcia, and José García, were conducting a preventative crime patrol.

According to the policemen, because they believed Mr. Hernández was driving without a valid driver's license, they stopped the defendant and approached his vehicle. Officers Pérez and Méndez proceeded to the driver's side of the car where Mr. Hernández was seated. The defendant lowered his window. The subsequent course of events and facts are in dispute. Police agents Méndez and Pérez state that after the window was lowered, Agent Pérez observed an open purse hanging from the neck of the defendant. Because the purse was open, Pérez was able to view a revolver inside the bag. He opened the door while Agent Méndez obtained the purse and forced the defendant out of the car, arresting him and reading him his rights. The woman accompanying Mr. Hernández was also arrested.

The defendant and Madeline Rivera both claim that the four agents, all armed with weapons, approached the Toyota. Officer Pérez knocked on the window, which was lowered, and ordered the defendant to open the door. As the defendant unlocked the door, Pérez opened the door and took hold of defendant's closed purse, which, according to the defendant, was wedged between his thighs. After seizing the purse, Pérez took it to the back of the car, unzipped it, and discovered the weapon. The defendant and Ms. Rivera were then arrested and taken to the police station.

Once they arrived at the police station, the officers stated that the vehicle was registered for confiscation purposes, and an inventory was conducted by Agents José García and Julio Pérez Tirado. Agent Méndez signed the In and Out Receipt and Vehicle Inventory List. *See* Government's Exhibit 2, submitted during October 17, 1989, Suppression Hearing. Defendant also signed this receipt. Sometime thereafter, Agent Méndez took the defendant and Ms. Rivera to the Ponce courthouse for a probable cause hearing. The complaints for the weapons case and the case against Mr. Hernández driving without a driver's license were signed by a judge at 11:58 a.m. *See* Defendant's Exhibits A, B, and D, submitted during December 7, 1989, Suppression Hearing. The officers claim that Méndez was not present during the inventory search of the car.

At 12:15 p.m. on the same day, Agent Hilario Marrero, who was working a guard post shift on that date, received an anonymous phone call from a woman who asked him whether Mr. Cano Bufi had been arrested. *See* Government's Exhibit 1, submitted during November 21, 1989, Suppression Hearing. After Officer Marrero told the anonymous caller that the defendant had been arrested for possession of a firearm, the caller stated that there were drugs under the dashboard near the steering wheel of the defendant's Toyota. Agent Marrero notified Agent Pérez, who was, according to the government's version of the facts, still conducting the inventory along with Agent José García. Agent Pérez then examined the car, and under the dashboard attached to the steering wheel, discovered 52 decks of heroin. This heroin was promptly seized at about 12:30 p.m. Agent Pérez presented this case to a Puerto Rico Commonwealth judge who signed the complaint at 2:30 p.m.

The defendant and Ms. Rivera both maintain that after the initial stop and arrest, they were taken to the police station, where the police fingerprinted the defendant and Ms. Rivera, confiscated Mr.

Hernández' vehicle and searched it. After the search, the police found nothing and locked up the car. Ms. Rivera and the defendant were then taken to the Commonwealth Court and brought back to the police station. After lunch, the defendant and Ms. Rivera claim that while they were seated in the police station, Agent Pérez approached the defendant and showed him the bag of heroin. He then transported the defendant and Ms. Rivera back to court in order to file a separate complaint based on the discovery of the heroin.

### B. *Procedural History*

After several Suppression Hearings, the Magistrate issued his first Report and Recommendation on January 25, 1990, ("Report and Recommendation I") denying the defendant's motion to suppress. The defendant filed objections to this Report and Recommendation. He later filed a Motion Requesting Reopening of the Suppression Hearing in order to give Ms. Rivera an opportunity to testify since the Magistrate's findings specifically noted the absence of Ms. Rivera, "a disinterested passenger as a witness." Report and Recommendation I at 10. The motion was granted, and in July of 1990, the Magistrate reopened the Suppression Hearing in order to receive the testimony of Ms. Madeline Rivera. The Magistrate issued another Report and Recommendation ("Report and Recommendation II") in September of 1990, in which he once again denied the motion to suppress. Defendant has filed objections to this Report and Recommendation.

## II. INITIAL STOP OF DEFENDANT

■ The defendant contends that there was a lack of reasonable, articulable suspicion on the part of the officers when they initially decided to stop him on July 18, 1989. The government counters that the officers who stopped the defendant had a sufficient basis upon which to believe that he was committing a traffic violation by driving without a driver's license.

■ The issue of whether the police officers had reasonable justification to stop

Mr. Hernández falls within the Fourth Amendment's proscription against unreasonable searches and seizures since stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979). In *Terry v. Ohio*, the Supreme Court stated that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). In the context of stopping a driver in order to check the driver's license and registration, the Supreme Court has further explained that such stops are unreasonable under the Fourth Amendment unless there is at least "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law...." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401.

This rule reflects the well-founded constitutional principle that the reasonableness of seizures which are less intrusive than an arrest depend upon "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361 (1979). In order to justify an intrusion without upsetting this delicate balance, the seizure must be based on specific, objective facts demonstrating that society's legitimate interests require the seizure of the individual in a particular circumstance. *Id.*, 443 U.S. at 51, 99 S.Ct. at 2640.

■ When determining the reasonableness of a *Terry* stop, the court must first consider whether the officer's action was justified at its inception and then whether the action subsequently taken was reasonably related in scope to the circumstance justifying the interference in the first

place.[1] *United States v. Stanley*, 915 F.2d 54, 57 (1st Cir.1990). In deciding whether the police action initially taken was justified, the court must review the totality of the circumstances confronting the officers, *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir.), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987), and must give due weight, "not to ... inchoate and unparticularized suspicion or 'hunch', but to the *specific reasonable inferences*" which the officers are entitled to draw from the facts in light of the officers' experience and training. *United States v. Walker*, 924 F.2d 1, 4 (1st Cir.1991) (emphasis added).

In the instant case, the agents did not stop the defendant because they believed he was about to commit a crime. The sole basis upon which the agents decided to stop Mr. Hernández was their alleged belief that he was driving without a license, in violation of the local laws. *See* Transcript of Preliminary Hearing, Testimony of Agent Méndez, at 9, 34–35, 44; Suppression Hearing, Tr. Vol. I at 16, 41–47; Tr. Vol. III, at 5, 29, 32. Specifically, the government contends that Agents Méndez and Pérez Tirado had knowledge that the defendant was driving without a license because sometime before July 18, 1989, Juan F. Arevalo, a fellow officer, told a group of agents which included Méndez and Pérez, that he had stopped Mr. Hernández López and at the time, Mr. Hernández López did not have a license. Tr. Vol. I at 49; Tr. Vol. III at 35.[2] Agent Pérez also testified that he knew Mr. Hernández did not have a license because when he was in a prior case involving weapons charges, in 1984 or 1985, Agent Pérez was filing some papers and noticed that the defendant did not possess a valid driver's license. *Id.* at 35–36.

According to Agent Arevalo Echevarría, the officer whose information formed the basis of the agents' decision to stop the defendant, he saw the defendant on July 5, 1989, at approximately 8:00 p.m. while on duty in the area of Arístides de Chavier Housing Development in Ponce. At the time he was patrolling, Officer Arevalo was with another agent, Henry Morales Lamboy. Tr. Vol. II at 39. Officer's Arevalo's testimony is unclear in describing the actual date this stop occurred. The transcript reads:

Q Taking as a starting point July 18, 1989, when was the *approximate* time that you see [sic] him [the defendant].

A July 5, '89.

*Id.* at 36 (emphasis supplied). Later on in his testimony, Officer Arevalo stated that he was certain it was July 5, 1989, but no further testimony or evidence verified this date.

When the officer observed the defendant, he was accompanied by a woman and a small child. *Id.* Officer Arevalo was uncertain whether he first saw Mr. Hernández inside the car or outside the car. Initially he testified that he saw the defendant driving the Toyota at approximately 8:00 p.m., but later stated that he was outside of the car when he first saw him. *Id.* at 36, 40. Upon the Court's request for clarification, Mr. Arevalo stated "I was moving in my car when I saw [the defendant] outside his vehicle ... I first saw him outside the vehicle, and then I saw him driving." (Tr. 49.)

Officers Arevalo and Morales were in the process of investigating a call they had received concerning a Toyota which had been stolen in the same neighborhood when they saw the defendant. Because the defendant was driving a Toyota, Agent Arevalo stopped him, exited his patrol car with Agent Morales, and asked the defendant for his driver's license and car registration. The defendant responded that he had no driver's license. *Id.* at 37. Agent Arevalo

---

1. Because we conclude that the initial stop was not justified in this case, *see* discussion *infra*, we neither discuss nor analyze the second prong of this reasonableness test.

2. During cross examination of the defendant, the government uncovered the fact that Mr. Hernández López had pled guilty on several occasions, prior to July of 1989, for driving without a license. However, none of the agents who stopped the defendant claimed that these prior guilty pleas formed the basis of their belief that the defendant was driving without a license on the date they stopped him, July 18, 1989.

then asked the woman sitting next to Mr. Hernández whether she had a valid license. Immediately thereafter, the officer received a radio call informing him that the stolen vehicle had been found and he was to report to the location of the vehicle. Upon discovering that the woman had a valid driver's license, Officer Arevalo then instructed her to change places with the defendant so that he would be the passenger. *Id.* at 37–38. Officers Morales and Arevalo left, and the defendant was not charged with any traffic violation. Agent Arevalo did not see the defendant after that occasion. Officer Arevalo stated that approximately one day later, in the morning, he told Agent Pérez and some other officers in the Drug and Narcotics Division of the Ponce Police Department that he had "intervened" with Mr. Cano Bufi, and that he did not have a license. *Id.* at 38. However, there was no written record of this investigatory stop, and Mr. Arevalo did not pursue filing a complaint or further investigation. Moreover, the government did not submit any evidence related to the stolen Toyota which was recovered on the same night defendant was stopped by Officers Arevalo and Morales, so that the exact date of this occurrence has not been verified with any written document. Also, the government did not present Officer Morales Lamboy to testify and corroborate Agent Arevalo's statement.

The defendant testified that Agent Arevalo never stopped him one or two weeks before his July 18, 1989, arrest. Tr. Vol. V at 27–28. He further asserted that he did not meet Officer Arevalo until the day he was arrested when he asked him to make a telephone call from the front desk of the police station. *Id.*

The Magistrate, giving credibility to Agent Arevalo, concluded that "the knowledge that defendant was *probably* driving without a license was present at the moment of the seizure." Report and Recommendation I at 9 (emphasis supplied). The Magistrate further stated that the agents who detained the defendant's vehicle had reasonable suspicion based upon articulable facts which would allow them to believe that the defendant was driving without a license. *Id.* at 11. Therefore, the stop to check the defendant's license was not pretextual and was within the boundaries of reasonableness as established by *Terry* and the First Circuit standards.

We disagree with the Magistrate's conclusion and hold that Agent Arevalo's verbal communication to his fellow officers of his intervention with the defendant is insufficient, by itself, to constitute the necessary objective factual basis to justify an intrusion upon defendant's constitutionally protected right to be free from unreasonable seizures. *Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400. The Magistrate's Report and Recommendation I and II state that in light of Agent Arevalo's testimony and other considerations of credibility, the stop was based on reasonable articulable suspicion. Although the Magistrate emphasizes the importance of credibility in this case, he fails to point out that an administrative investigation conducted by the Police of Puerto Rico uncovered the fact that Agent Pérez Tirado (a main witness in this Suppression Hearing), along with another agent, distorted facts during a suppression hearing which led to the arrest of a defendant in a case in the local courts. *See* Defendant's Exhibit F, submitted during December 11, 1989, Suppression Hearing. Further, in Report and Recommendation I, the Magistrate states that "going unimpeached Agent Arevalo's testimony makes us conclude ... that the stop to check the license was not a pretext...." Report and Recommendation I at 11. However, the Magistrate fails to recognize several inherent flaws in Arvealo's testimony: no evidence verifies the exact date and time he stopped the defendant; Officer Arevalo did not remember the date he related the information concerning the stop to Agent Pérez and the other officers, and he did not remember, by name, any of the other officers who were there when he related this information; and Agent Morales, who accompanied Officer Arevalo during his patrol that night, did not testify in order to corroborate that this incident actually occurred.

In addition, all the cases the Magistrate cites when concluding that the officers' de-

cision to stop the defendant, founded upon Officer Arevalo's statement, fell within the established Fourth Amendment standards of reasonableness, are clearly distinguishable. In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the initial stop of the defendant was based on the fact that the officers personally *observed* defendant driving an automobile with an expired license plate, in violation of the Pennsylvania Motor Vehicle Code. In *United States v. Trullo*, 809 F.2d 108 (1st Cir.1987), the reasonableness—the specific objective facts—of the police officers' initial stop was based on suspicious behavior on the part of the defendant and defendant's presence in a well-known area of prostitution and drug dealing. Finally, in *United States v. Gilliard*, 847 F.2d 21 (1st Cir.1988), the decision to stop the defendant was based on the general reputation of the neighborhood and a specific lead from a source of proven credibility, as well as the officer's personal observations of the defendant engaging in incriminating behavior—an exchange of currency and the placing of an unknown substance into a bag defendant carried. *Id.* at 25.

In this case, the officers did not observe the defendant engaging in any incriminating behavior, and the area in which the defendant was stopped does not appear to be a well-known area of crime.[3] The only "fact" upon which the agents relied when they stopped the defendant was Officer Arevalo's alleged verbal comment to a group of agents that he had previously "intervened" with the defendant and discovered that the defendant was driving without a license. However, Agent Arevalo did not proceed to arrest the defendant, and did not make any type of official report to document this stop, such as a police logbook entry stating the exact time and date of the occurrence. Also, aside from a sergeant, he could not remember the names of any of the officers who were present when he left the defendant on the night of July 5, 1989, in order to assist in the recovery of the stolen Toyota. *Id.* at 45. Moreover, he did not remember when he related the information to Agent Pérez, as well as the other officers, and whether Officer Méndez was present when he told his fellow coworkers about this incident. *Id.* at 41–42.

We recognize that police conducting a stop need not personally observe the facts forming the basis of the reasonable, articulable suspicion justifying the initial stop, and that clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability. *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). However, some tips either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. *Id.*, 407 U.S. at 147–48, 92 S.Ct. at 1923–1924. In the instant case, Officer Arevalo's verbal communication on an unspecified date to an unidentified group of officers, standing alone without any verification, cannot form the objective basis for reasonable suspicion. Such an oral communication does not satisfy the Fourth Amendment requirement compelling specific objective facts to justify the defendant's right to be free from "unfettered governmental intrusion every time he enter[s] his automobile." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401. *See also McReynolds v. State*, 441 So.2d 1016 (Ala.App.1983) (officer's knowledge that defendant was *arrested* for driving without license one year prior to stop was insufficient to constitute reasonable, articulable suspicion justifying stop which led to arrest and subsequent discovery of marijuana). As the Supreme Court has acknowledged, such a stop, based on less than objective criteria, risks arbitrary and abusive police practices exceeding tolerable limits. *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640.

We further note that reasonable articulable suspicion may be grounded upon the

---

3. The Magistrate stated that the area in which defendant was stopped was not a "place where you go for an afternoon stroll without carrying a weapon probably." July 18, 1990 Suppression Hearing at 31. However, the Magistrate made no further conclusion or reference to the area in either Report and Recommendation, and more importantly, the agents did not state that this factored into their decision to stop the defendant.

collective knowledge of law enforcement personnel involved in the investigation. However, this suspicion must still be based upon objective criteria—specific facts— which justify the investigatory *Terry* stop. For example, in *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985), the police stopped a person because they suspected he was involved in a completed felony. Their suspicion was based on a flyer issued by another police department indicating that the defendant was wanted for investigation of a felony. The Court concluded that the flyer had been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person had committed an offense, and the police could therefore rely on the flyer to justify a brief stop to check identification, pose questions to the person, or detain the person briefly while attempting to obtain further information. *Id.* at 232, 105 S.Ct. at 682. The flyer was based on an officer's interview with an informant who revealed many details of the alleged robbery and admitted tangential participation in the robbery. The officer obtained a *written statement* from the informant and immediately issued the "wanted flyer" to other police departments in the area. *Id.* at 234, 105 S.Ct. at 683. Such information was sufficiently reliable and credible to arouse reasonable suspicion of criminal activity and to constitute the specific, articulable facts needed to justify a stop. *Id.*

In its decision, the Court discussed the factors involved in balancing the type of the intrusion on personal security and the importance of the governmental interest alleged to justify the intrusion. When a case involves a stop to investigate past rather than ongoing criminal activity, the Court noted that the balancing factors "may be somewhat different" because the governmental interests and the nature of the intrusion are different in these two contexts. *Id.*, 469 U.S. at 228, 105 S.Ct. at 680:

A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law.

*Id.*

Similarly, in *United States v. Moore*, 817 F.2d 1105 (4th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987), a police officer received notice from the Charleston South Carolina police dispatcher that a silent burglar alarm had sounded. The Fourth Circuit held that the burglar alarm provided a reasonable basis to believe that a burglary had just occurred; verification of the circumstance would surrender the opportunity to catch the criminal. *Id.*, 817 F.2d at 1107.

In this case, the officers stopping the defendant received no verification that the defendant was driving without a license other than an informal conversation. Moreover, the previous stop communicated through the conversation—the basis of the officers' suspicion justifying the stop—did not result in any immediate action against the defendant such as arrest, the imposition of a fine, or the filing of a report, so that any governmental interest alleged to justify the subsequent stop on July 18, 1989, cannot include considerations of exigency due to ongoing criminal activity when balanced against defendant's right to be free from unreasonable seizures.

Therefore, we are compelled to conclude that in light of the totality of circumstances, the officers' decision to stop the defendant on July 18, 1989, was not supported by articulable, objectively reasonable facts necessary to safeguard the defendant's right to be free from unreasonable searches guaranteed by the Fourth Amendment. If the Constitution were to permit such a stop based on an unsubstantiated informal conversation, the Fourth Amendment guarantees would be seriously circumscribed so that people would be

stripped of any Fourth Amendment protection once they step from the sidewalks into their automobiles. *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401.

## III. CONCLUSION

Wherefore, in view of the foregoing, we conclude that the defendant's Fourth Amendment right was violated when the officers initially stopped him on July 18, 1989, and that the evidence obtained as a result of this illegality should be suppressed. *See Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. at 1884; *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *United States v. Berryman,* 717 F.2d 651, 659 (1st Cir.1983). Defendant's Motion to Suppress is therefore GRANTED.

IT IS SO ORDERED.