**UNITED STATES of America**

**v.**

**Jeffrey M. PEARL and Roger J. Girardin, Defendants.**

**Criminal No. 96–46–P–C.**

United States District Court, D. Maine.

Nov. 6, 1996.

Donald E. Clark, Asst. U.S. Atty., Office of the U.S. Attorney, Portland, ME, for the Government.

William Maselli, Sheila A. Cook, Law Office of William Maselli, Auburn, ME, for Defendant Jeffrey M. Pearl.

John P. Gause, Berman & Simmons, Lewiston, ME, for Defendant Roger J. Girardin.

## ORDER GRANTING DEFENDANTS' MOTION TO SUPPRESS

GENE CARTER, Chief Judge.

By a two-count indictment, Defendants Girardin and Pearl were charged with drug conspiracy in violation of 21 U.S.C. § 812, § 841(a)(1), § 841(b)(1)(C) and § 846, and possession with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 812, § 841(a)(1), § 841(b)(1)(C) and 18 U.S.C. § 2. Indictment (Docket No. 4). Now before the Court are Defendant Girardin's and Defendant Pearl's Motions to Suppress Evidence. (Docket Nos. 14 and 15, respectively). Because the Court concludes that Defendants were stopped, searched and arrested in violation of their constitutional rights, the Court will grant both motions.

### I. FACTS

Based on the evidence presented at a suppression hearing, the Court finds the facts to be as follows: at approximately 10:00 p.m. on the evening of April 6, 1996, Officer Charles Denault, a patrolman for the Kittery Police Department, while on patrol[1] in an unmarked police cruiser, drove into a well-lighted parking area behind the Maine Information Center building, a rest stop located at an exit off Interstate–95. Transcript of Suppression Hearing at 1–4, 6, 8. The building, which contained restrooms for motorists as well as outdoor telephone booths, was open for public use and was occupied at that hour. Tr. at 83, 101, 107, 117. According to Officer Denault's testimony at the suppression hearing, the weather that evening was chilly with "a lot of precipitation forming fog and cloud[s] but not raining." Tr. at 8.

As he proceeded in his cruiser into the parking area behind the Information Center building, the officer observed a two-door vehicle parked in the lot, about 300 feet away from the building. Tr. at 6, 13. He did not notice any other cars parked in that immediate area. Tr. at 6, 85. The pavement of the parking lot sloped upwards slightly in the direction that the officer was driving, towards the parked vehicle. Tr. at 85, 115. As he approached the vehicle from its passenger side, the officer observed a male emerging from the passenger side door and then standing outside the car, stretching. Tr. at 9. The passenger door was left ajar, and the officer saw a second male sitting in the driver's seat, with one foot on the ground. Tr. at 9, 88. At a distance of about 200 to 300 feet away, Officer Denault turned on his high beams "to see what was going on." Tr. at 9, 45, 47. The officer testified that while positioned at this distance, he "noticed something was being dumped out on the driver's side of the vehicle." Tr. at 9. He claimed that he "could see straight under the car and [he] saw what appeared to be a cloud of stuff hitting the pavement."[2] Tr. at 88. He also stated that he made this observation through the open door of the vehicle. Tr. at 9.

The officer stated that his reason for stopping to make an inquiry at that point was to investigate a littering violation. Tr. at 10, 89–90. The officer testified that as he came within 10 to 20 feet of the car, he saw the individual on the passenger side, identified shortly thereafter as Anthony Destefano, turn towards the vehicle and mouth the word "COPS." Tr. at 11, 47. Officer Denault also saw a third person sitting in the back seat of the vehicle, whom he "could barely make out," subsequently identified as Jeffrey Pearl. Tr. at 11, 12. The officer stopped his cruiser at a forty-five degree angle to the right rear side of the vehicle and approached Destefano, asking him for his license. Tr. at 10–12. Destefano told Denault that he and his companions were experiencing car trouble. Tr. at 13. The officer then asked the driver for identification. Tr. at 14. As Defendant Girardin emerged from the car and

---

1. The officer referred to his duty that evening as a "saturation patrol," in which he drove around in his cruiser with the intention of "looking for people under the influence." Tr. at 4.

2. The officer testified that later in the evening he had the opportunity to observe that there was a pile of ashes, cigarette remnants and contents of an ashtray on the ground next to the driver's side door. Tr. at 80.

approached the officer, Mr. Destefano began walking around towards the officer's right side. Tr. at 14. Officer Denault asked Destefano to stop moving, and Destefano obeyed the instruction. Tr. 14–15.

At that point, according to the officer, the third occupant was in the back seat of the vehicle, making "[furtive] movements."[3] Tr. at 15. Officer Denault then ordered the third person, later identified as Jeffrey Pearl, to step out of the car. Tr. at 15. Defendant Pearl emerged from the back seat of the two-door vehicle and placed a bottle on the roof of the car.[4] Tr. at 15–16. According to the officer, Defendant Pearl stepped out of the car "backwards," and continued walking backwards towards the officer for about three to four steps. Tr. at 16. Pearl gave the officer his identification. Tr. at 17. The officer then perceived that the three individuals were communicating with each other and he became concerned for his safety, whereupon he called for back-up, and instructed the three individuals to place their hands on the hood of the car. Tr. at 17. After four additional officers arrived, the inquiry culminated in a pat-down search of Defendant Pearl's person, yielding the evidence, the admissibility of which is now at issue. Tr. at 22–27, 33.

## II. DISCUSSION

The legal issue is limited to whether Police Officer Denault, upon driving into a well-lit parking area at 10:00 p.m. behind a public facility that was open and occupied, and seeing a vehicle 300 feet away from the building straddling two parking spaces, with no other vehicles in sight, and an occupant standing outside the car mouthing the word "COPS," had a legal basis for making an investigative stop. The Supreme Court has held that "[a] limited investigative stop of a person is reasonable under the fourth amendment if the police have an articulable and reasonable suspicion that he is engaged in criminal activity." *United States v. Streifel,* 781 F.2d 953, 957 (1st Cir.1986), *citing United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

In evaluating the reasonableness of investigative stops authorized by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a court is to inquire "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), *quoting Terry,* 392 U.S. at 23, 88 S.Ct. at 1881. The Government contends that Officer Denault's initial investigatory stop was supported by his reasonable suspicion that the Defendants were engaged in littering, in violation of Me.Rev.Stat.Ann. tit. 17, § 2264 (West 1964 & Supp.1995–96). Defendants argue that the officer lacked an articulable suspicion at the point at which he stopped the occupants of the vehicle to investigate. Having heard the testimony at the suppression hearing, the Court concludes that when the officer stopped his cruiser and approached the Defendants to ask for identification, he did not have a reasonable or articulable suspicion of criminal activity.[5] Hence, the officer's action was not "justified at its inception," and he lacked a legal basis for making an investigative stop.

The officer articulated four circumstances which led him to suspect that there was criminal activity afoot. The Court considers

---

**3.** While the transcript records this description as "further" movements (*see* Tr. at 12), the Court's personal recollection is that the officer testified that he observed "furtive" movements, and the Court believes that the phrase which appears in the transcript reflects a reporter's error.

The officer characterized these movements as follows: "turning his body towards me and basically hunched over slightly and moving around excessively in the back seat." *Id.* It should be noted that the officer did not state that he observed these movements before stopping his cruiser to investigate.

**4.** Although Denault originally testified that he had seen a beer bottle on the top of the car, he admitted on rebuttal that he was not sure whether it was a beer bottle or some other kind of bottle. Tr. at 15, 58, 164.

**5.** It should be noted that the Court does not rely on the credibility of witnesses Pearl or Girardin. Instead the Court concludes that the relevant inquiry is whether from the officer's perspective, there was a legal basis for effecting a *Terry* stop.

each circumstance here in chronological order.

First, the officer stated that from a distance, he saw a cloud of debris being dumped out of the automobile. Tr. at 88. The officer testified that he did not decide to investigate further until he saw the material dumped out of the driver's side of the car. Tr. at 60. The Court finds, however, that the testimony of Officer Denault regarding the dumping of ashes is simply not credible. The Court is persuaded that on a foggy night from a distance of 200 to 300 feet, the officer, even with his high beams on, could not see through the underside of the Defendants' vehicle or through the open passenger side door a "cloud" of ashes being dumped on the far side of the vehicle. Instead, it is reasonable to infer from the fact that the officer confronted Destefano first on the passenger side, to ask for identification, that the officer's attention was actually focused on Destefano and not focused on what was happening underneath or on the far side of the vehicle. Moreover, the record contains no testimony that the officer noticed smoldering embers of cigarettes from a distance, which would present a more plausible explanation for why the officer's attention could have been captured from such a distance. The Court believes, rather, and finds that the officer actually discovered this pile of debris later on in his inquiry. Because the officer's testimony that he was investigating a littering violation is not credible, the Court concludes that the alleged observation of the dumping of ashes cannot form the legal basis for a *Terry* stop.

Second, the officer testified that the vehicle was "straddling two parking [spaces]." Tr. at 9. He stated that he considered it significant that the vehicle was parked in that fashion, based on his experience with individuals operating under the influence of alcohol. Tr. at 89. Yet Officer Denault stated that "[w]hen [he] first saw the vehicle . . . [he] couldn't tell the way it was parked on the lines," and his testimony does not establish that the officer noticed the position of the car before he intercepted its occupants. Tr. at 87. Moreover, the officer conceded

that up to the point where he saw the car parked askew, he was not investigating a case of operating under the influence. Tr. at 89. He also stated that observing the car straddling two lanes would not be enough, in itself, to lead him to investigate further:

Q. If you had not seen [the ashtray dumped] you would have driven right on by?

A. Sure.

Q. So there was no issue they were parked in between two spaces?

A. When I was a rookie I probably would have stopped but no.

Q. But if that is not an issue, you probably would have kept on going if that is all you saw?

A. Yes.

Based on this record, the Court finds that a reasonable officer in Denault's position would not have had an articulable suspicion of criminal activity solely based on the observation that the vehicle was parked straddling two lanes.

Third, the officer stated that Anthony Destefano, the male who exited from the passenger side, saw the officer approaching and turned towards the vehicle and mouthed the word "COPS." Tr. at 87. The Court is unpersuaded that the officer could have observed Destefano, whose head was turned away from officer Denault and towards the car, mouthing words to his companions. In any case, the Court does not believe that simply remarking on the presence of law enforcement officers is, in itself, inherently suspicious behavior.

Fourth, the officer testified that as he approached the vehicle, his observations of Destefano's demeanor caused him to suspect that there was criminal activity afoot. As he observed Destefano exiting the car, "stretching, and backing up, turning slightly in [the officer's] direction," the officer concluded that Destefano was under the influence of something, and inferred, on this basis alone, that the operator of the car might be under the influence of alcohol.[6] Tr. at 9, 90, 91.

---

**6.** Officer Denault testified that when he later observed Destefano up close, Destefano's face was sweating, and he appeared "rigid," which caused the officer to conclude that Destefano was

The Court finds that the officer's observations of Destefano's actions and demeanor alone does not provide a reasonable and articulable basis for suspicion of criminal activity. To conclude otherwise, the Court would have to find that a reasonable officer would infer, from the behavior of a person standing on the passenger side of a parked vehicle that the operator of the vehicle might be operating under the influence, or that the person on the passenger side was actually the operator. The Court finds that neither of these inferences is reasonable.

In assessing the reasonableness of an investigative stop, a court must look not merely to individual factors, but instead to the "totality of the circumstances." *United States v. Trullo,* 809 F.2d 108, 112 (1st Cir. 1987). The Court must weigh the effect of the factors combined, rather than individually. *United States v. Gilliard,* 847 F.2d 21, 24 (1st Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989). Specifically, the Court must decide whether Officer Denault's observation of the car straddling two parking lanes, and the passenger mouthing the word "COPS," taken together, form the basis for a reasonable suspicion that criminal activity was afoot. The Court is unpersuaded that these two actions would be construed by the reasonably prudent officer to be suspicious enough to warrant further investigation. Hence, the Court holds that the officer's action in parking his cruiser to effect an investigative stop was not "justified at its inception," and that the events which flowed from this illegal stop—specifically, the detention of the individuals at the scene, the pat-down of Defendant Pearl, and the subsequent arrest of both Defendants—were therefore unconstitutional. It should be noted that while the events which flowed from the officer's *Terry* stop raised legitimate safety concerns, given the actions of the vehicle's occupants and the fact that the officer was handling the investigation alone, the Court concludes that the inquiry should not have proceeded to that point.

under the influence of something other than alcohol. Tr. 18–19. However, since the officer acquired this information after making the *Terry*

### III. CONCLUSION

Accordingly, it is *ORDERED* that Defendants' Motions to Suppress Evidence be, and they are hereby, *GRANTED.*

stop, it cannot serve as the basis for his initial investigative stop.